UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JAY EDISON WALLACE and LANA WALLACE, | No. C09-0823RSL |
| Plaintiffs, | |
| v. | ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| ISLAND COUNTY, MICHAEL HAWLEY, and JOHN DOES 1-4, | |
| Defendants. | |

    This matter comes before the Court on "Defendants' Motion and Memorandum for Summary Judgment" (Dkt. # 58) and "Plaintiffs' Motion for Partial Summary Judgment to Vacate the Labor Arbitration Decision" (Dkt. # 83). In their First Amended Complaint, plaintiffs allege claims of negligence, breach of implied covenants, public record act violations, civil rights violations, arbitration award procured by fraud/misconduct, tortious interference, intentional and/or negligent infliction of emotional distress, and defamation and false light. Dkt. # 49. Plaintiffs have moved to vacate the labor arbitration decision, while defendants seek summary judgment on all of plaintiffs' claims.

    Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party will

have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. Celotex Corp., 477 U.S. at 325. If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150-51 (2000).

The production of "a scintilla of evidence in support of the non-moving party's position" is not sufficient to create a genuine issue of material fact, however. Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995). Nor may hyperbole, supposition, or conclusory accusations substitute for actual evidence. CarePartners LLC v. Lashway, 2010 WL 1141450 (W.D. Wash. 2010) (citing British Airways Bd. v Boeing Co., 585 F.2d 946, 955 (9th Cir. 1978)). The production of a stack of uncited documents in opposition to or in support of a motion for summary judgment does not satisfy a party's burden. The Court need not, and will not, "scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996); see also, White v. McDonnel-Douglas Corp., 904 F.2d 456, 458 (8th Cir. 1990) (the court need not "speculate on which portion of the record the nonmoving party relies, nor is it obliged to wade through and search the entire record for some specific facts that might support the nonmoving party's claim").[1]

---

[1] Plaintiffs have consistently failed to provide pin-point citations to the record in violation of Local Civ. R. 10(e)(6). Dkt. # 83 at 2-8, 9, 15-17; Dkt. # 80 at 5-11, 15-17, 21-25, 31, 34-35. In addition, many of plaintiffs' basic factual contentions are based solely on citations to the narrative of events provided by Deputy Wallace. Dkt. # 72. This reliance on mostly inadmissible evidence has made it very difficult to determine whether a genuine issue of material fact exists because the majority of the statements in Deputy Wallace's declaration are not based on personal knowledge of the events he describes. The Court has spent an inordinate amount of time hunting through the voluminous record in an attempt to find the evidentiary basis for plaintiffs' factual contentions.

On September 6, 2011, the Court heard oral argument. The Court subsequently ordered the parties to file proper declarations that comply with the Federal Rules of Evidence and to provide additional briefing on discrete issues. Dkt. # 109. Having considered the memoranda, declarations, and exhibits submitted by the parties, having heard the arguments of counsel, and taking the facts in the light most favorable to the non-moving parties, the Court finds as follows:

## BACKGROUND

In July 2005, Sheriff Michael Hawley[2] announced that he would not run for another term as Sheriff of Island County. Dkt. # 59-1. By the end of 2005, there were four candidates for the Republican nomination, including Deputy Jay Wallace.[3] Dkt. # 59 at ¶ 30; Dkt. # 116 at ¶ 31. Sheriff Hawley declined to endorse any candidate in the hopes of keeping the Sheriff's office focused on its public safety mission during the election cycle. Dkt. # 59-1. In private conversation, however, Sheriff Hawley indicated that he would prefer "anybody but Jay Wallace" as the new Sheriff. Dkt. # 78 at ¶ 20.

Sometime after 11:23 p.m. on February 7, 2006, Deputy Wallace responded to a 911 call.[4] Dkt. # 72 at ¶ 19; # 73-1 at 10; Dkt. # 114 at ¶ 19. Deputy Wallace reported to dispatch that he observed an individual putting on a pair of pants, running to the back of the residence, and refusing to answer. Dkt. # 73-1 at 11. Deputy Wallace spoke with a neighbor who confirmed that a man fitting the subject's description was supposed to be in the house.

---

[2] The Court recognizes that defendant Hawley is no longer the Sheriff of Island County. However, for simplicity, the Court will refer to him as Sheriff Hawley since he was the Sheriff at the time of the relevant events.

[3] The Court recognizes that plaintiff Wallace is no longer a Deputy in Island County. However, for simplicity, the Court will refer to him as Deputy Wallace since that was his title at the time of the relevant events.

[4] The parties spend a significant amount of time explaining the differences between "warm line" and "hang-up" 911 calls and the policies for responding to each type of call. The distinction between these types of calls, although helpful to the Court's understanding of the facts, is not relevant to the legal analysis because the Court has not been asked to determine whether Deputy Wallace violated any policies. Accordingly, the Court will refer to the calls as simply 911 calls.

ORDER REGARDING MOTIONS FOR
SUMMARY JUDGMENT - 3

Dkt. # 73-1 at 12. Deputy Wallace concluded that the subject was not in need of any assistance, but noted that "he's refusing to answer the door or even make himself known at this point." Dkt. # 73-1 at 12. Just before 2:00 a.m. on February 8, 2006, another 911 call came in from the same address. Deputy Wallace responded to dispatch, "[T]here was no problem there. The party just would not open the door. . . . He seemed in good health." Dkt. # 73-1 at 12. He also told dispatch that the "guy ran into the living room, threw on a pair of pants, ran back to the bedroom . . . and wouldn't answer the door. . . . There was no problems there, cause [sic] he was the only one there . . . ." Dkt. # 73-1 at 13. Deputy Wallace did not respond to the second 911 call.

At approximately 11:00 a.m. on February 8, 2006, Victoria Walker made a 911 call and stated that she had been assaulted the previous night. Ms. Walker stated that she had called 911, but that her assailant, Matthew Friar, would not let her open the door when the police responded. Dkt. # 59-2 at 32-34. In a statement taken by Detective Susan Quandt at the hospital to which she was transported, Ms. Walker stated that Mr. Friar had placed her in the closet and threatened to kill her and her son if she made her presence known to the deputy. Dkt. # 59-4 at 5. Ms. Walker also described the physical assault in detail. Dkt. # 59-4 at 4.[5]

On February 9, 2006, Sheriff Hawley opened an internal investigation to determine whether Deputy Wallace violated Sheriff's office policies when he failed to make contact with the 911 caller and subsequently failed to respond to a second call. Dkt. # 59 at ¶ 14; Dkt. # 116 at ¶ 14. Deputy Wallace was notified of the investigation and that a woman had reported that she was held against her will and assaulted in the house to which he had twice been dispatched. Dkt. # 59 at ¶ 20; Dkt. # 59-2 at 24; Dkt. # 116 at ¶ 20. He was also informed that this was a serious matter requiring independent investigation, that Sheriff Hawley believe

---

[5] A criminal investigation was conducted into Ms. Walker's allegations, and the prosecutor filed an information charging Mr. Friar with Unlawful Imprisonment, Harassment - Threats to Kill, and Assault in the Fourth Degree - Domestic Violence. Dkt. # 73 at 7-8. The charges against Mr. Friar were dismissed without prejudice later than month because investigators and the prosecuting attorney "were unable to ever regain contact with" Ms. Walker. Dkt. # 73 at 2.

his actions may have jeopardized the victim's safety, and that he should refrain from discussing the matter with anyone other than his family, his lawyer, and his union representatives. Dkt. # 59 at ¶ 20; Dkt. # 59-2 at 24; Dkt. # 116 at ¶ 20. Sheriff Hawley appointed a recently-retired Chief Deputy, J.D. Burns, to conduct an internal investigation. Dkt. # 59 at ¶ 14; Dkt. # 116 at ¶ 14.

Within days, news that an unnamed Island County Deputy had been placed on leave pending the outcome of an investigation regarding 911 policy violations was reported in the newspapers. Dkt. # 74. Quotations attributed to Sheriff Hawley indicated that he believed the alleged policy violations were serious and that, "[i]f these allegations regarding the behavior of my deputy are true, it's very disturbing that we perhaps had an opportunity to end this victim's night of terror." Dkt. # 74 at 1. Utilizing a public records search, the press quickly identified Deputy Wallace as the deputy under investigation. Dkt. # 74 at 5. Pursuant to Sheriff Hawley's directions, however, Deputy Wallace was not permitted to talk to the media regarding the allegations against him.

As part of the investigation into the alleged policy violations, Deputy Wallace was directed to provide a report, which he submitted on February 14, 2006 (but dated February 8, 2006). Dkt. # 72 at ¶18; # 73-1 at 4-7; Dkt. # 114 at ¶ 18. In his report, Deputy Wallace stated that he had observed a naked female with shoulder length dark hair running towards the front door where he stood. Dkt. # 73-1 at 4-7. According to Deputy Wallace, "[t]he naked female grabbed her jeans in an effort to put them on, as she hopped around naked on one foot. All during this time, she stood next to the front door, and could have opened the door at anytime." Dkt. # 73-1 at 4-7.

Investigator Burns brought the discrepancies between the 911 transcripts (in which Deputy Wallace reported seeing only a male in the house) and the Deputy's subsequent report to Sheriff Hawley's attention. Sheriff Hawley decided to expand the scope of the internal investigation and asked the Police Chief of the City of Oak Harbor to conduct a criminal investigation to determine whether Deputy Wallace had filed a false report. Dkt. # 59 at ¶¶ 17-18; Dkt. # 116 at ¶¶ 17-18. Deputy Wallace was notified of the second investigation.

Dkt. # 74-2 at 40.  Sergeant Jerry Baker, who was assigned to conduct the investigation, interviewed Mr. Friar and the neighbor, both of whom made statements consistent with Deputy Wallace's communications on the night of February 7, 2006, and inconsistent with the report he submitted on February 14, 2006.  Dkt. # 59 at ¶ 18; Dkt. # 59-4 at 17-21; Dkt. # 116 at ¶ 18.[6]  On March 16, 2006, Deputy Wallace provided written answers to questions posed by Investigator Burns in which he reiterated that he had seen a female in the residence.  Dkt. # 59-5 at 43-46.[7]

Investigator Burns issued an Internal Investigation Report describing his investigation regarding the events of February 7-8, 2006, and summarizing his findings.  Dkt. # 74-2 at 24-53.  As part of the investigation, Investigator Burns interviewed Sergeant Rick Norrie, Deputy Wallace's direct supervisor, visited the residence, interviewed neighbors, reviewed the 911 transcript,[8] contacted the detective who was investigating the alleged assault on Ms. Walker, attended Ms. Walker's second interview, and reviewed statements made by Mr. Friar.  Dkt. # 74-2 at 33-42.  He ultimately concluded that Deputy Wallace had mishandled both the initial 911 call (by failing to make contact with the caller) and the second 911 call (by

---

[6]  In August 2006, Deputy Wallace was formally charged with False Swearing in violation of RCW 9A.72.040(1).  Dkt. # 69-4 at 13-14.  The court ultimately determined that the report submitted on February 14, 2006, was "compelled" and could not be used against Deputy Wallace in a subsequent criminal proceeding.  Dkt. # 69-4 at 18-20.  The criminal charge against Deputy Wallace was dismissed for lack of evidence on February 13, 2007.  Dkt. # 69-4 at 25-26.

[7]  An interview scheduled with Deputy Wallace had to be canceled because of a death in his family.  Rather than force Deputy Wallace to "endure an additional delay" (the interview had been difficult to schedule and was cancelled once "due to attorney intervention"), Investigator Burns opted to propound written questions.  Dkt. # 74-2 at 32 and 40.

[8]  The transcript of the first call coming from the residence starts with a male voice saying "I'll fuck you up (inaudible)."  Dkt. # 73-1 at 10.  New recording technology had been installed which instantly picked up and digitally record communications on a 911 call even before the call rings in the dispatch center.  The dispatchers had not yet been trained on the new equipment, however, so neither they nor Deputy Wallace were aware of the threatening statement on February 7-8, 2006.  Dkt. # 74-2 at 36.

failing to respond) and that Deputy Wallace had provided false information regarding the events of that night.

Upon conclusion of the internal investigation, Sheriff Hawley scheduled a meeting with two of his chief deputies, two deputy sheriff union representatives, Deputy Wallace, a union attorney, and Deputy Wallace's private attorney. Dkt. # 59 at ¶ 21; Dkt. # 72 at ¶ 65; Dkt. # 114 at ¶ 66; Dkt. # 116 at ¶ 21. Although Deputy Wallace and his representatives were given an opportunity to comment and provide new information, mitigating circumstances, or rebuttal evidence regarding Investigator Burns' report, Deputy Wallace declined to participate, apparently because he did not trust Sheriff Hawley "and believed that anything that [he] said would be twisted and used against [him] like he had done with [the] report and like he had reported in the media." Dkt. # 59 at ¶ 21; Dkt. # 72 at ¶ 65; Dkt. # 114 at ¶ 66; Dkt. # 116 at ¶ 21. On April 10, 2006, five days after the meeting, Sheriff Hawley issued his "Sheriff's Findings." Dkt. # 59-7 at 1-14. After reminding Deputy Wallace that, as a trained law enforcement officer, the public expected him to "be honest, expeditious and thorough in the performance of his . . . duties," Sheriff Hawley concluded that Deputy Wallace had shirked his duties twice during the night of February 7, 2006, and that the material inconsistencies in his statements to dispatch and subsequent written statements compelled a finding that Deputy Wallace was "dishonest regardless which version more closely mirrors reality." Dkt. # 59-7 at 12. Sheriff Hawley further stated:

> But, the weight of the evidence is clear and compelling as to which version is the truthful one. On the evening in question, you had no reason to be dishonest. Further, your comments captured by ICOM's recording system are in sync with other evidence and witness statements. There is no doubt in my mind that your radio traffic and telephone conversations with ICOM at the time of the incident/s reflect events as they really occurred. That being the case, your subsequent sworn report and written response during the internal investigation contain numerous, self-serving falsehoods and blatant lies. This is disgraceful and unlawful.

Dkt. # 59-7 at 12-13. Deputy Wallace was discharged for good cause based on "the seriousness of [his] policy violations, and solely because of [his] dishonesty and untruthfulness." Dkt.

# 59-7 at 13. When a reporter from KIRO TV contacted Sheriff Hawley to inquire why a candidate for Sheriff had been fired, Sheriff Hawley did not pull his punches: "[Deputy Wallace's] behavior has been disgraceful, he should not be elected dog catcher." Dkt. # 59 at ¶ 25; Dkt. # 72-1; Dkt. # 116 at ¶ 25.

On April 11, 2006, the union grieved Deputy Wallace's termination under the collective bargaining agreement. Dkt. # 70-2 at 21-22. The union requested "copies of all documents, records, archive's notes, investigative materials, including the names and statements of all witnesses interviewed, including those of the alleged victim and suspect in the original call, and any other material relied on by the Department in reaching this decision." Dkt. # 70-2 at 21.[9] Deputy Wallace produced two witnesses who testified that he had mentioned seeing a woman at the residence prior to learning that he was under investigation. Dkt. # 59-11 at 10-11; Dkt. # 76 at 17-18. On April 8, 2008, the arbitrator found that the witnesses' belated testimony was insufficient "to contradict the overwhelming evidence developed by Investigator Burns as to the events of February 7 and 8, 2008." Dkt. # 59-11 at 22. The arbitrator concluded that since Deputy Wallace's "proven misconduct of filing a false police report goes directly to the essence of the employer/employee relationship, . . . the Employer had just cause to impose a penalty of discharge without utilizing progressive discipline." Dkt. # 59-11 at 22.

In September 2008, the Washington State Criminal Justice Training Commission ("CJTC") issued a statement of charges to revoke Deputy Wallace's peace officer certification based on his termination for conduct that would constitute a crime involving dishonesty or false statement. Dtk. # 59-13 at 2. An administrative hearing was held in February 2009. Dkt. # 59-13 at 1. On May 7, 2009, the CJTC issued its findings of fact and conclusions of law, revoking

---

[9] In his declarations, Deputy Wallace materially alters this quotation (by deleting the phrase "including the names and statements of all witnesses interviewed") and uses the altered quotation to support his argument that the union requested all investigative materials related to Mr. Friar's criminal charges. Dkt. # 72 at ¶ 68; Dkt. # 114-1 at ¶ 69.

Deputy Wallace's certification. Dkt. # 59-13 at 1-18. Deputy Wallace did not appeal the arbitration ruling or the CJTC order. Instead, he filed this action on May 11, 2009.

## DISCUSSION

### I. Evidentiary Considerations

In resolving a motion for summary judgment, the Court may only consider admissible evidence. Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002). Defendants object to various materials submitted by plaintiffs on the grounds of speculation, hearsay, improper opinion, irrelevance, lack of foundation, and lack of personal knowledge. Dkt. # 84 at 1-6. At the oral argument held on September 9, 2011, the Court identified certain deficiencies with the evidence provided by both parties and ordered them to revise their declarations so that they conform with the Federal Rules of Evidence. Dkt. # 109. This exercise was only marginally successful. The Court has reviewed all the evidence, including the revised declarations, and finds as follows:

**A. Declarations of Michael Hawley** (Dkt. # 116) **and John Sawyers** (Dkt. # 115-1)

Both Sheriff Hawley and Deputy Sawyers make statements that are inadmissible on the basis of speculation, lack of personal knowledge, improper opinion testimony, hearsay, and/or improper legal conclusion. For example, Sheriff Hawley's recitation of what Deputy Wallace said at his deposition (Dkt. # 116 at ¶ 8) is pure hearsay and probably outside of his personal knowledge. Deputy Sawyers, for his part, makes broad accusations (such as "[i]t became obvious that Deputy Wallace was the target of Lieutenant Hawley because of Deputy Wallace's candidacy for Island County Sheriff") with virtually no admissible supporting facts. Dkt. # 115-1 at ¶ 9.[10] The Court has considered only those statements that appear to be within the personal knowledge of the witness and are otherwise admissible.

---

[10] Even if Deputy Sawyers had personal knowledge regarding the oil change reprimand Deputy Wallace reportedly received, there is no indication that Sheriff Hawley knew of, much less was involved in, the reprimand.

**B. Declarations of Dale Kamerrer** (Dkt. # 118), **Gregory McBroom** (Dkt. # 113-1), **and Carl Swanes** (Dkt. # 79)

Counsel may attach to their declarations documents produced in this litigation or deposition testimony taken in this litigation, but may not provide substantive testimony or argument as to the content of such documents or testimony. Fed. R. Evid. 602. The original declarations prepared by Mr. Kamerrer and Mr. McBroom are hereby STRICKEN. The revised declarations provided after oral argument are acceptable and have been considered.

Exhibits A and B to Dkt. # 79 are Mr. Swane's summaries of the depositions of Sergeant Rick Norrie and Deputy Scott Davis. Mr. Swane's truncated interpretation of a witnesses testimony is irrelevant and inadmissible. Exhibits A and B to Dkt. # 79 are hereby STRICKEN. The Court has considered the actual deposition testimony of these witnesses to the extent it was provided in the record.

**C. Declarations of Owen Burt** (Dkt. # 77 and # 78)

Plaintiffs have retained Mr. Burt as a law enforcement expert. Expert testimony is permitted if "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. An expert witness may testify in the form of an opinion if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Id. An expert witness cannot give an opinion as to his legal conclusion, "i.e., an opinion on an ultimate issue of law," because instructing the jury on the law is the exclusive province of the Court. Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1016 (9th Cir. 2004).

Testimony regarding written policies and procedures of which the witness has personal knowledge falls within the realm of lay testimony. To the extent Mr. Burt has provided testimony regarding matters within his personal knowledge, including written policies and procedures, he may testify as a lay witness. The Court also finds that Mr. Burt's specialized knowledge of unwritten policies, practices, procedures, or professional standards of law enforcement, including appropriate responses to 911 calls, hang ups, and warm lines, may

assist a trier of fact to understand the evidence. The remainder of Mr. Burt's report and declarations is not based on personal knowledge and is not properly characterized as expert testimony insofar as it is not specialized knowledge that would assist a trier of fact to understand the evidence or to determine a fact in issue.

Accordingly, the Court strikes the portions of Mr. Burt's report and declarations that do not involve (1) lay testimony as to his personal knowledge or (2) expert testimony regarding policies, practices, procedures or professional standards of Island County law enforcement.

**D. Declaration of Jay Wallace** (Dkt. # 114-1)

Even after his declaration was revised, Deputy Wallace does not limit himself to statements of fact of which he has personal knowledge. The majority of his declaration consists of argument, analysis and interpretation of other evidence (much of which is not in the record and/or not cited), supposition, improper opinion testimony, and/or hearsay. For example, Deputy Wallace states that "Lt. Hawley was opposing my candidacy [for Sheriff] at all times relevant to this matter" (Dkt. # 114-1 at ¶ 2) but fails to identify any statement or conduct prior to the events of February 7-8, 2006, that suggests opposition or even a personal dislike. His interpretations of the evidence are not only improper, they are sometimes so one-sided that they verge on the illogical. See Dkt. # 114-1 at ¶ 61 (construing Mr. Friar's statement that he was fully clothed and in the living room when Deputy Wallace shined his light into the house as proof that Deputy Wallace saw a naked woman in the room). Plaintiffs have, in effect, attempted to turn their 40-page response (which the Court hesitatingly approved) into a 60+ page argument through the improper use of Deputy Wallace's declaration.

In accordance with the Federal Rules of Evidence, the Court has considered statements of fact that appear to be within Mr. Wallace's personal knowledge and that are otherwise admissible. The Court has also considered the exhibits attached to Mr. Wallace's declaration. The Court has disregarded all other statements, including argument, legal conclusions, hearsay, and improper opinion testimony.

**E. Speculation and Hearsay in General**

The Court has not considered deposition testimony or other sworn statements that are not based on the witnesses' personal knowledge. For example, much of Sergeant Norrie's testimony is based on speculation and/or hearsay and has not been considered. See, e.g., Dkt. # 68-1 at 21 ("[T]hey were very concerned about Deputy Jay Wallace running for sheriff because there was – I can't say specifically did I hear, but there was innuendoes to the extent that he was taking votes away from another candidate that was running that could possibly lose an opportunity for somebody else to get elected that they somewhat supported."); Dkt. # 68-1 at 34 ("I've heard that communication records had some seemingly placed or skewed or changed, I don't know.").

**II. Plaintiffs' Motion to Vacate Arbitration Ruling**

Plaintiffs argue that the Court should vacate the April 2008 arbitration award because the finding that there was just cause to terminate Deputy Wallace's employment was obtained through "corruption, fraud, or other undue means." Dkt. # 83 at 8. In order to invalidate an arbitration award because of fraud, the party seeking vacation must show that the fraud was (1) not discoverable upon the exercise of reasonable diligence prior to the arbitration, (2) materially related to an issue in the arbitration, and (3) established by clear and convincing evidence. A.G. Edwards & Sons, Inc. v. McCollough, 967 F.2d 1401, 1404 (9th Cir. 1992); see also Seattle Packaging Corp. v. Barnard, 94 Wn. App. 481, 487 (1999) (holding that under Washington state law, an arbitration award may be vacated based on "corruption, fraud or other undue means" if the moving party establishes the existence of fraud by clear and convincing evidence, the fraud was not discoverable upon the exercise of due diligence before the close of the arbitration hearing, and the fraud materially related to an issue of consequence in the arbitration).

Plaintiffs' claim of fraud is based on defendants' alleged concealment of evidence and the submission of "false evidence, opinion and claims to the arbitrator." Dkt. # 83 at 9. Plaintiffs claim that defendants failed to produce the investigative file regarding Ms. Walker's allegations of sexual and physical assault against Matthew Friar until after the arbitration

proceeding was completed (and just before the decertification hearing). In particular, plaintiffs identify the report of Detective Susan Quandt as evidence that should have been provided. The Quandt report includes, among other things, interviews with Ms. Walker, conversations with Ms. Walker's doctors, summaries of Detective Quandt's day-to-day activities as the investigating officer, and information regarding Ms. Walker's criminal history, prior false statements, and mental health issues. Dkt. # 73 at 14-39.

Plaintiffs argue that the Quandt report and other investigative materials related to the allegations against Mr. Friar were responsive to an April 11, 2006, request for documents propounded by the union attorney Patrick Emmal. Dkt. # 59-8 at 9. They were not. Mr. Emmal requested "copies of all documents, records, archive's notes, investigative materials, including the names and statements of all witnesses interviewed, including those of the alleged victim and suspect in the original call, and any other material relied on by the Department in reaching this decision." Dkt. # 70-2 at 21. "[T]his decision" meant the decision to terminate Deputy Wallace's employment. The investigative materials Mr. Emmal requested related to the investigation of Deputy Wallace's conduct, not Mr. Friar's. While Mr. Emmal's request encompassed statements taken from Ms. Walker and Mr. Friar, it was limited to those statements that were relied upon by Sheriff Hawley when he fired Deputy Wallace. Detective Quandt did not complete her report until after Deputy Wallace was fired, and plaintiffs have made no effort to show that it (or a draft) was considered when making the termination decision.

Even if one were to assume that Sheriff Hawley relied upon pre-termination statements of Ms. Walker and Mr. Friar when determining whether Deputy Wallace violated policies and/or filed false reports, and that transcripts of these statements were not provided in response to Mr. Emmal's request, the omission would not justify overturning the arbitration decision. A discovery dispute over what should have been produced prior to arbitration does not necessarily establish fraud or intentional concealment. The fact that Ms. Walker and Mr. Friar were interviewed during the course of the criminal investigation was not hidden from

Deputy Wallace. He could have, with the exercise of reasonable diligence prior to the arbitration, obtained copies of any statements they had made.

In addition, the criminal investigation file and its contents are only tangentially related to the issues presented to the arbitrator. Deputy Wallace was accused of shirking his duty and falsifying a report in an attempt to avoid blame. The question before the arbitrator was "did Island County have just cause to terminate Deputy Wallace's employment?" A thorough review of all of the evidence submitted by plaintiffs, including the materials they say were withheld during the arbitration, fails to reveal anything that could be considered "exonerating" evidence. The stories Ms. Walker and Mr. Friar told during the investigation were materially inconsistent with Deputy Wallace's February 14th report and support the arbitrator's finding that Deputy Wallace lied. Although plaintiffs suggest that evidence regarding Ms. Walker's mental health and criminal record would have established that she was not assaulted, such a conclusion would neither be compelled nor supported. The fact that Ms. Walker may have had a difficult or unsavory life tells us very little about the events of February 7-8. Evidence other than Ms. Walker's statements support her story, and an independent prosecutor, with full knowledge of the criminal investigation and Ms. Walker's history, chose to file charges against Mr. Friar based on the totality of the evidence.

Even if it turns out that Ms. Walker fabricated or exaggerated her allegations against Mr. Friar (a finding that has never been made and is not supported by the record before the Court), the arbitrator was tasked with determining whether Deputy Wallace appropriately responded to the 911 calls and/or lied about the events of February 7th. The answers to those questions are not impacted by the contents of the investigative file related to Mr. Friar. The way Deputy Wallace handled the two 911 calls and the material discrepancies in his February 14th report do not depend on whether or not Ms. Walker was held against her will and assaulted. Plaintiffs' allegations of concealment do not justify the vacation of the arbitrator's decision.

Plaintiffs also allege that defendants intentionally misled the arbitrator by repeatedly stating that Ms. Walker had been beaten and raped as a result of Deputy Wallace's

failure to respond to the 911 calls in an appropriate manner. Plaintiffs maintain that this allegation was false and that it materially influenced the arbitrator's decision. In their post-hearing brief, defendants state four times that Ms. Walker was beaten and raped. Dkt. # 72-2 at 5, 21, 29, 33. There was, however, no judicial finding that Ms. Walker was physically and sexually assaulted on the night of February 7th: rather, these statements were based on Ms. Walker's allegations. While repeating a victim's statements without proper attribution may have been overzealous and/or careless, it does not rise to the level of fraud in this case. There was ample evidence in the record to support defendant's statements, even if they were not judicially-proven facts.[11] Mere "sloppy or overzealous lawyering" does not constitute fraud or undue means. A.G. Edwards & Sons, Inc. v. McCollough, 967 F.2d 1401, 1403 (9th Cir. 1992).[12]

More importantly, there is no indication that the arbitrator was fooled into thinking that the assault and rape accusations had been proven beyond a reasonable doubt. Throughout the post-hearing brief, defendants attribute the allegations of rape and beating to Ms. Walker and/or acknowledge that the accusations had not been established. Dkt. # 72-2 at 6, 19, 22, 25. The arbitrator, for his part, refers to the rape and beating as part of the employer's argument or properly attributes those allegations to Ms. Walker. Dkt. # 59-11 at 10, 12, 16, 17. The arbitrator never states as a matter of fact that Ms. Walker had been beaten and raped. Finally, the arbitrator based his decision that there was just cause for termination on his findings that Deputy Wallace violated policy and was dishonest: the decision was not based on the alleged assault. Dkt. # 59-11 at 15, 17-22.

Having waded through the voluminous record in this matter, heard the arguments of counsel, and attempted to follow the logic of plaintiffs' arguments, the Court feels compelled

---

[11] See Dkt. # 59-2 at 28 (911 recording of profane threat); Dkt. # 59-2 at 32-35 (911 recording in which Ms. Walker stated she was assaulted); Dkt. # 73 at 18, 19, 24, 25, 27 (Quandt Report summarizing Ms. Walker's statements regarding physical and sexual assault and physical evidence of injuries).

[12] The cases cited by plaintiff on this issue are factually distinguishable and unpersuasive.

to note that, in plaintiffs' strenuous efforts to discredit Ms. Walker and her accusations by any means, they make unsupported arguments and draw irrational inferences that would, if not carefully analyzed, mislead the Court regarding the state of the record. For example, plaintiffs baldly state that "[t]here was no evidence that Victoria Walker was a victim of any crime." Dkt. # 83 at 5. The statement is simply false. Plaintiffs ignore Ms. Walker's allegations, the various pieces of evidence that support those allegations, and the prosecutor's decision to file an information charging Mr. Friar with Unlawful Imprisonment, Harassment - Threats to Kill, and Assault in the Fourth Degree - Domestic Violence. Dkt. # 73 at 7-8. The fact that Mr. Friar was not found guilty does not mean that a crime did not occur, or that Ms. Walker's allegations were false. It simply means, unremarkably, that Mr. Friar could not be prosecuted after the complaining witness disappeared. Ms. Walker's relationship with Mr. Friar and her criminal and drug histories may bear on her credibility, but these factors fall well short of proving that her allegations were false. Plaintiffs' misstatements and overstatements in this proceeding are far more troubling and material than those of which defendants are accused.

For all of the foregoing reasons, plaintiffs have failed to demonstrate that defendants concealed relevant information or put forth false evidence to the arbitrator that would justify vacating the arbitration award for corruption, fraud, or other undue means. The Court therefore DENIES plaintiffs' motion for partial summary judgment.

## III. Defendants' Motion for Summary Judgment

### A. Negligence Claim

Plaintiffs allege that defendants had a duty to provide full and accurate information to Deputy Wallace and the arbitrator and that they breached this duty by failing to provide the Friar investigative file in a timely manner and by asserting that Ms. Walker had been beaten and raped. Dkt. # 49 at 9. The source of the alleged duty is unclear. Plaintiffs have not identified, and the Court is unaware of, a free-floating obligation to provide full disclosure from one person to another or to ensure that all communications are factually accurate. Such a duty may, of course, arise in certain circumstances. For example, parties who share a special or fiduciary relationship, parties who are under a legal duty to provide

disclosures or speak the truth, or parties to a contract may be subject to specific disclosure and accuracy obligations.  Although plaintiffs argue that certain duties arose from the collective bargaining agreement, they have asserted a contract-based claim to address the alleged breach.  Absent some indication that a common law duty of disclosure or truthfulness applied in this case, plaintiffs' negligence claim must fail.

Defendants' motion for summary judgment regarding plaintiffs' negligence claim is GRANTED.

**B. Breach of Implied Covenant of Good Faith and Fair Dealing**

Plaintiffs allege that Island County breached the covenant of good faith and fair dealing when it failed to provide evidence that was material to the grievance procedure in a timely manner (*i.e.*, the criminal investigation files related to Mr. Friar).[13]  Dkt. # 49 at 9-10.  Plaintiffs argue that defendants' failure to produce the criminal investigation documents related to Mr. Friar breached the collective bargaining agreement and a longstanding Sheriff's office policy to produce all exculpatory information related to an internal investigation.  Dkt. # 80 at 29-30.[14]

---

[13]  In their complaint, plaintiffs also assert that defendants breached the covenant by making false statements to the arbitrator – presumably the statement that Ms. Walker was beaten and raped.  Dkt. # 49 at 9-10.  Plaintiffs do not support this claim in their response to defendants' motion for summary judgment.

[14]  The Court ordered the parties to provide additional briefing regarding whether section 301 of the Labor Management Relations Act ("LMRA") preempts plaintiffs' negligence and breach of implied covenant claims.  Pursuant to Section 2(2) of the Wagner Act, 29 U.S.C. § 152(2), "[t]he term 'employer' includes any person acting as an agent of an employer, directly or indirectly, but shall not include . . . any State or political subdivision thereof . . . ."  Defendants do not dispute that Island County is a "political subdivision" of the State of Washington, as that term has been interpreted by the National Labor Relations Board and the Supreme Court.  NLRB v. Natural Gas Util. Dist., 402 U.S. 600, 604-05 (1970).  Congress "enacted the § 2(2) exemption to except from Board cognizance the labor relations of federal, state, and municipal governments, since governmental employees did not usually enjoy the right to strike."  Natural Gas Util. Dist., 402 U.S. at 604.  At the time it enacted the Wagner Act, Congress was not willing to intrude upon the employment relationship between the State and its employees: considerations of state sovereignty and the Eleventh Amendment's grant of immunity from suit in federal courts militated in favor of the exclusion.  Crestline Mem'l Hosp. Assoc., Inc. v. NLRB, 668 F.2d 243, 245 n.1 (6th Cir. 1982).  In passing the Taft-Hartley Act,

Plaintiffs' breach of contract claim, to the extent it was properly alleged, fails. Plaintiffs have not identified any provision of the collective bargaining agreement that was breached. Nor did plaintiffs exhaust the grievance mechanism provided in the collective bargaining agreement regarding the employer's alleged failure to provide information. See DelCostello v. Int'l Blvd. of Teamsters, 462 U.S. 151, 163 (1983). Deputy Wallace's failure to exhaust the collective bargaining agreement grievance procedures (or show that his union violated its duty of fair representation) mandates dismissal of the breach of contract claim. See DelCostello, 462 U.S. at 164; Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 987 (9th Cir. 2007).

Plaintiffs' argument regarding policy violations fails as a matter of fact. As the Court has already noted, a thorough review of all of the evidence submitted by plaintiffs, including the materials they say were withheld during the arbitration, fails to reveal anything that could be considered "exculpatory." The criminal investigation generated statements and evidence that support the arbitrator's finding that Deputy Wallace mishandled the 911 calls and made materially false statements in his February 14th report. No reasonable juror, in full possession of the record presented here, could reasonably conclude that because Ms. Walker had mental health and credibility problems, she was not assaulted on the night of February 7th and Deputy Wallace's version of events must be true.

Defendants' motion for summary judgment regarding plaintiffs' claim for breach of implied covenant of good faith and fair dealing is GRANTED.

**C. Public Records Act ("PRA") Claim**

Plaintiffs allege that defendants' failure to produce the investigative file related to the charges against Mr. Friar in response to Mr. Emmal's April 11, 2006, request violated the

_____

Congress incorporated the definitions contained in the Wagner Act, including the public entity exclusion. As compellingly reasoned by the Third Circuit, "the legislative silence during the passage of the Taft-Hartley Act with reference to the carrying forward of the exemption for states and political subdivisions, if it meant anything, meant approval of the exemption." Crilly v. Southeastern Pa. Transp. Auth., 529 F.2d 1355, 1363 (3rd Cir. 1976).

ORDER REGARDING MOTIONS FOR
SUMMARY JUDGMENT - 18

PRA. Defendants argue that the PRA claim is barred by the statute of limitations. Dkt. # 58 at 15. Plaintiffs maintain that the statute of limitations did not begin to run until the last production responsive to the record request was made, which plaintiffs assert was February 2009. Dkt. # 80 at 19. Because the Court finds that plaintiffs' request for information related to his grievance did not constitute a public records request, the Court need not address the statute of limitations issue.

Mr. Emmal testified that the obligation to provide collective bargaining-related documents is broader than the obligation to produce documents under the PRA, such that all requested information, whether privileged or not under the PRA, should have been produced in response to his request. Dkt. # 68-1 at 6-7, Ex. A at 21:23-22:25. Mr. Emmal did not testify that he had made, or intended to make, a public records request under the PRA. Rather, he was seeking discovery related to a union member's grievance and expected the production to proceed as contemplated under the collective bargaining agreement. Under plaintiffs' theory, every request for documents under a collective bargaining agreement with a public entity would constitute a public records requests, thereby converting simple discovery disputes into potential statutory violations. There is nothing in the statute or the record presented here that would justify such conflation.

Defendants' motion for summary judgment with respect to the PRA claim is GRANTED.

**D. Section 1983: Due Process Claim**

Defendants argue that plaintiffs' due process claim should be dismissed because of the preclusive effect of the arbitration and administrative decisions. Dkt. # 58 at 17.[15] The arbitration decision does not, however, preclude litigation of related statutory claims. The arbitrator's authority over the grievance procedure derived solely from the collective bargaining agreement. See Dkt. # 69 at 44-65 (Ex. F at Art. 5). The Supreme Court has held that

---

[15] Defendants seek dismissal of a "veiled" wrongful termination claim. Because the complaint does not assert a wrongful termination claim, the Court will address only whether collateral estoppel bars plaintiffs' § 1983 claim for constitutional violations.

arbitration of contract-based claims pursuant to a collective bargaining agreement does not preclude subsequent judicial resolution of statutory claims. See McDonald v. City of W. Branch, 466 U.S. 284, 292 (1984) (holding that "in a § 1983 action, a federal court should not afford res judicata or collateral-estoppel to effect an award in an arbitration proceeding brought pursuant to the terms of a collective-bargaining agreement."); Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 745 (1981) (holding that unsuccessful arbitration of union's collective bargaining agreement did not preclude federal lawsuit alleging violations of the Fair Labor Standards Act); Alexander v. Gardner-Denver Co., 415 U.S. 36, 49, 59-60 (1974) (holding that arbitration of whether employee was discharged for just cause was not preclusive of Title VII claims because collective bargaining agreement did not cover statutory claims). Since the employees in McDonald, Barrentine, and Gardner-Denver "had not agreed to arbitrate their statutory claims, and the labor arbitrators were not authorized to resolve such claims, the arbitration in those cases understandably was held not to preclude subsequent statutory actions." 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 129 S. Ct. 1456, 1468 (2009). In this case, Deputy Wallace requested an employment arbitration pursuant to the collective bargaining agreement, which does not expressly authorize the arbitrator to decide § 1983 claims. Dkt. # 69 at 49 (Ex. F, Art. 5). Accordingly, the Court will not give preclusive effect to the arbitration decision.

With respect to the decision of the CJTC, the Court must determine whether the state administrative tribunal was acting in a judicial capacity to resolve disputed issues of fact that were properly before it and provided the parties with an adequate opportunity to litigate. United States v. Utah Constr. & Mining Co., 384 U.S. 394, 422 (1966); Miller v. County of Santa Cruz, 39 F.3d 1030, 1032-33 (9th Cir. 1994) (federal common law rules of preclusion "extend to state administrative adjudications of legal as well as factual issues, even if unreviewed, so long as the state proceeding satisfies the requirements of fairness outlined in [Utah Construction]." In determining whether a state administrative proceeding provided an adequate and fair opportunity to litigate, the Court considers whether the proceeding was conducted with sufficient safeguards to be equated with a state court judgment. Miller, 39 F.3d at 1033; Plain v. McCabe, 797 F.2d 713, 719 (9th Cir. 1986). The Court has therefore reviewed

the administrative record to ensure that the proceeding meets Washington's criteria for giving preclusive effect to a state agency's decisions.

Under Washington law, "[c]ollateral estoppel, or issue preclusion, bars relitigation of an issue in a subsequent proceeding involving the same parties." Christensen v. Grant Cnty. Hosp. Dist. No. 1., 152 Wn.2d 299, 306 (2004). Collateral estoppel precludes the relitigation of issues that were "necessarily and finally determined in the earlier proceeding," even if a different claim or cause of action is asserted in the later proceeding. Christensen, 152 Wn.2d at 306-07. To invoke collateral estoppel, defendants must establish that: (1) the issue decided in the earlier proceeding was identical to the issue presented in the later proceeding; (2) the earlier proceeding ended in a judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party to, or in privity with a party to, the earlier proceeding; and (4) application of collateral estoppel does not work an injustice on the party against whom it is applied. Christensen, 152 Wn.2d at 306-07. Decisions of administrative agencies may be given preclusive effect in subsequent litigation, but Washington courts will consider the following additional factors when determining whether an administrative decision precludes relitigation of an issue: (1) whether the agency acted within its competence in making a factual decision, (2) agency and court procedural differences, and (3) policy considerations. State v. Dupard, 93 Wn.2d 268, 275 (1980).

The CJTC hearing at issue here resembled a judicial proceeding. The parties appearing in the hearing were the Washington State Criminal Justice Training Commission and Deputy Wallace. Both sides were represented by counsel, both sides had an opportunity to present testimonial and documentary evidence, and both sides submitted memoranda and presented arguments. See Dkt. # 59-13 at 1. Deputy Wallace testified on his own behalf and presented the testimony of Lana Wallace, Michael Gregory Anderson, Sergeant Norrie, Deputy Franklin Gomez, and Deputy John Sawyers. Id. at 4 ¶ 2.3. The CJTC panel also considered documentary exhibits offered by both parties. Id. at 4-5 ¶¶ 2.4-2.5. The CJTC panel made specific findings of fact and conclusions of law regarding disputed issues.

Plaintiffs argue that they did not have a full and fair opportunity to litigate the issues underlying his § 1983 claim in the state administrative proceeding because the CJTC panel limited evidence to "avoid re-arbitrating" the validity of the termination. Plaintiffs assert that the panel precluded Deputy Wallace from calling a particular witness and declined to consider evidence that cast doubt on Ms. Walker's credibility. Dkt. # 80 at 15. The only citation provided is to Exhibit AA of the Declaration of Gregory A. McBroom (Dkt. # 70-3 at 2), but that exhibit relates to the arbitration proceeding, not the CJTC proceeding.[16] A review of the transcript of the CJTC proceeding shows that the main issue before the panel – whether the CJTC should revoke Deputy Wallace's peace officer's certification under RCW 43.101.105(1)(d) – necessarily involved an assessment of Deputy Wallace's conduct and the propriety of his termination. The panel had to determine whether Deputy Wallace was "discharged for disqualifying misconduct," *i.e.*, whether he was "terminated from employment for: (a) Conviction of . . . any crime involving dishonesty or false statement within the meaning of Evidence Rule 609(a) . . . [or] (b) conduct that would constitute any of the crimes addressed in (a) or this subsection." RCW 43.101.010(8).[17]

During the hearing, Presiding Sheriff Mahoney stated, "The panel is here today in the matter of former Island County Deputy Sheriff Jay Wallace, Cause no. 06-139, and to take evidence and rule on the petitioner's statement of charges as amended on December 8, 2008." Dkt. # 70-4 at 2. During the pre-hearing teleconference, Presiding Sheriff Mahoney ruled on

---

[16] Plaintiffs also state (without citation to the record) that the CJTC Statement of Charges against Deputy Wallace dated September 8, 2008, includes an assertion that the victim had been beaten and sexually assaulted. Dkt. # 80 at 15. The Court has not been able to locate in the voluminous record the Statement of Charges or the Amended Statement of Charges that formed the basis of the administrative hearing. Accordingly, the Court has disregarded this argument.

[17] The Court acknowledges that the criminal charges against Deputy Wallace for false swearing were dismissed because the court suppressed Deputy Wallace's officer's statement of February 14, 2006, pursuant to Garrity v. New Jersey, 384 U.S. 493 (1967), and Seattle Police Officers' Guild v. City of Seattle, 80 Wn. 2d 307, 310 (1972). Dkt. # 59-9. The exclusion of his statements in a criminal prosecution does not, however, require the exclusion of the same statements in non-criminal matters, such as Deputy Wallace's grievance and the decertification proceedings.

ORDER REGARDING MOTIONS FOR
SUMMARY JUDGMENT - 22

objections to proposed witnesses and exhibits based on their relevance to the amended statement of charges. Dkt. # 59-13 at 3; # 71-1 at 8-23. Presiding Sheriff Mahoney excluded the testimony of Deputy Davis and the Quandt report, among other evidence, because they were irrelevant, inadmissible hearsay, or redundant. Dkt. # 71-1 at 12, 14. Counsel for Deputy Wallace specifically requested the opportunity to review the criminal investigation file and offer evidence from it if she found "something that [she thought was] strictly relevant to the charges against Jay Wallace." Dkt. # 71-1 at 14. Presiding Sheriff Mahoney responded, "I would not have a problem with that as a process." Dkt. # 71-1 at 14. Presiding Sheriff Mahoney admitted the testimony of Michael Anderson, a witness from the criminal investigation. Dkt. # 70-4 at 18-24. Mr. Anderson testified that he saw Ms. Walker the night of the alleged assault hourly from 6:00 in the evening until 3:00 in the morning. Deputy John Sawyers also testified that Deputy Wallace had told him that he had seen a woman on the alleged night of the incident. Dkt. # 70-4 at 27-28. Plaintiffs were clearly permitted to present evidence regarding the events of February 7-8, 2006.

On April 29, 2009, the CJTC panel made specific findings of fact and conclusions of law. Regarding the false statements allegedly made by Deputy Wallace, the panel found:

> 3.29  Deputy Wallace knowingly made a false statement when he stated that he "observed a naked female with shoulder length dark hair, running towards me (towards the front of the residence). The naked female grabbed her jeans in an effort to put them on, as she hopped around naked on one foot. All during this time, she stood next to the front door, and could have opened the door at any time."
>
> * * *
>
> 3.31  Deputy Wallace knowingly made a false statement when he stated, regarding his talk with the neighbor: "I informed her that I had observed a thin female with shoulder length dark hair at the residence, fleeing to the rear of the house. . . ."
>
> * * *
>
> 3.37  In his written responses of March 15, 2006 to Special Investigator Burns, he knowingly made false statements that the gender of the person he observed in the residence at 1480 Shoreview Drive on February 7, 2006 was female.

ORDER REGARDING MOTIONS FOR
SUMMARY JUDGMENT - 23

Dkt. # 59-13 at 10-12. The panel also found that Deputy Wallace's intentional misstatements were material and were reasonably likely to be relied upon by Detective Quandt, Special Investigator Burns, and/or Sheriff Hawley in the discharge of their official powers or duties. Dkt. # 59-13 at 10-12. Based on the above findings of fact, the panel made the following conclusions of law:

> 4.12 . . . [Deputy Wallace] engaged in conduct that would constitute a crime involving dishonesty or false statement within the meaning of Evidence Rule 609(a), specifically, the crime of making a False or Misleading Statement to a Public Servant when he knowingly made false, material statements to Detective Quandt, Special Investigator Burns, and Sheriff Hawley through his written statement when he stated that he "observed a naked female with shoulder length dark hair, running towards me . . . . This conduct is disqualifying misconduct under RCW 43.101.010(8)(b).
>
>                                        * * *
>
> 4.14 . . . [Deputy Wallace] engaged in conduct that would constitute a crime involving dishonesty or false statement . . . through his written statement when, regarding his talk with the neighbor, he stated: "I informed her that I had observed a thin female with shoulder length dark hair at the residence, fleeing to the rear of the house." . . . This conduct is disqualifying misconduct under RCW 43.101.010(8)(b).
>
>                                        * * *
>
> 4.16 . . . [Deputy Wallace] engaged in conduct that would constitute a crime involving dishonesty or false statement . . . through his written response to Special Investigator Burns' questions . . . ." This conduct is disqualifying misconduct under RCW 43.101.010(8)(b).

Dkt. # 59-13 at 15-17.

       After a careful review of the administrative record provided to the Court, it is apparent that the CJTC panel did not simply adopt or even rely heavily on the arbitrator's findings. Rather, similar to a state court proceeding, the panel heard testimony, admitted (or excluded) evidence, and made an independent assessment of the issues before the panel. Deputy Wallace had an adequate opportunity to litigate the issue of whether his statements about seeing a woman were false and whether his termination was justified before the CJTC.

The fact that the presiding officer made adverse evidentiary rulings on the basis of relevance, hearsay, and/or duplicity does not mean that Deputy Wallace was deprived of a full and fair opportunity to litigate these issues. The Court finds that there are no policy considerations which militate against giving preclusive effect to the issues decided by the CJTC. To the extent plaintiffs seek to relitigate the truth of Deputy Wallace's statements that he saw a woman in the house or whether those statements justified his termination and the revocation of his peace officer's certification, they are precluded from doing so.

Plaintiffs allege that defendants deprived Deputy Wallace of "liberty and property interests, depriving him of both procedural due process and substantive due process rights within the meaning of the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution." Dkt. # 49 at 13. This claim appears to be based on the underlying assumption that Deputy Wallace truthfully reported seeing a woman in the house on February 7th and that Sheriff Hawley maliciously and improperly brought about his termination. Plaintiffs may not, however, collaterally challenge the conclusions of the CJTC panel or otherwise relitigate the findings that Deputy Wallace made false material statements and was properly terminated.

To the extent plaintiffs are claiming that they had a property or liberty interest in pursuing (or obtaining) the elected Sheriff's position, the due process claim also fails. Plaintiffs apparently acknowledge that Deputy Wallace had no property interest in the Sheriff's position, but argue that he had "a *liberty interest* in pursuing the elected position." Dkt. # 80 at 36 (emphasis in original). Plaintiffs cite Briscoe v. Kusper, 435 F.2d 1046, 1053, 1058 (7th Cir. 1970), in support of this proposition. Briscoe did not find that a citizen has a separate liberty interest in pursuing or obtaining an elected position, however. In fact, the court noted Supreme Court decisions which clearly state that candidates for political office do not have a liberty interest in being considered for an office or elected. See Snowden v. Hughes, 321 U.S. 1, 7 (1944) ("More than forty years ago this Court determined that an unlawful denial by state action of a right to state political office is not a denial of a right of property or of liberty secured by the due process clause. . . . we reaffirm it now.") (citing Taylor & Marshall v. Beckham, 178 U.S.

548, 577-78 (1900)).  See also Douglas v. Niagara County Bd. of Elections, 2007 WL 3036809 at *4 (W.D.N.Y. 2007) ("plaintiff lacked a protected property or liberty interest in his candidacy for Mayor of Niagara Falls.").

The Seventh Circuit did, however, note that "the concept of 'liberty' protected against state impairment by the Due Process Clause of the Fourteenth Amendment includes the freedoms of speech and association and the right to petition for redress of grievances." Briscoe, 435 F.2d at 1053.  Plaintiffs have not shown that this importation of First Amendment rights into the due process clause has been adopted by the Ninth Circuit.  Even if Briscoe were the law in this Circuit, Deputy Wallace, unlike the plaintiff in the Seventh Circuit case, was not excluded from the ballot by the type of arbitrary and capricious state action upon which a due process claim can be based.  Depute Wallace's right to participate in electoral politics was impaired only because his conduct in February 2006 made him unpalatable to the electorate.  To the extent plaintiffs are arguing that defendants made up the charges against him in order to ruin his candidacy, the CJTC panel has preclusively determined that Deputy Wallace made false statements justifying the revocation of his peace officer certification.  That issue cannot be relitigated here.

Defendants' motion for summary judgment regarding plaintiffs' due process claim is GRANTED.

**E.  Section 1983:  First Amendment Claim**

Plaintiffs allege that defendants "wrongfully terminated [Deputy Wallace's] employment for exercising his constitutional free speech rights and right to run for election as the next Island County Sheriff."  Dkt. # 49 at 11.  In order to sustain a First Amendment retaliation claim, a public employee must show that (1) the employee engaged in constitutionally protected speech, (2) the employer took adverse employment action against the employee, and (3) the employee's speech was a substantial or motivating factor in the adverse action.  Posey v. Lake Pend Oreille Sch. Dist. No. 84, 546 F.3d 1121, 1126 (9th Cir. 2008).  Once the employee satisfies his burden, the employer must show by a preponderance of the evidence that it would have reached the same decision or that it would have engaged in the

same conduct even in the absence of the protected expression.  Thomas v. Douglas, 877 F.2d 1428, 1431 (9th Cir. 1989).  The employee may refute this assertion by showing that the employer's proffered explanation is merely pretextual.  See Strahan v. Kirkland, 287 F.3d 821, 825 (9th Cir. 2002).

The Court will assume for purposes of this motion that participation in the electoral process is protected activity under the First Amendment (see Bardzik v. County of Orange, 635 F.3d 1138, 1144 (9th Cir. 2011) ("The First Amendment protects the rights of citizens to criticize a government official, to support a candidate opposing an elected official, or to run against an elected official.") and that Deputy Wallace suffered an adverse employment action when he was terminated.  Whether an employee's protected conduct was a substantial or motivating factor in an employer's decision to take action against the employee is a question of fact that normally should be left for trial. Ulrich v. City & County of San Francisco, 308 F.3d 968, 979 (9th Cir. 2002).  Defendants argue, however, that there is a complete lack of evidence from which a reasonable jury could conclude that plaintiffs' First Amendment activities were a substantial or motivating factor in his termination.  Dkt. # 58 at 20.

Plaintiffs' theory of the case is that Sheriff Hawley vigorously investigated the events of February 7-8 and the veracity of Deputy Wallace's February 14th report because he was looking for a way to derail his campaign for Sheriff.  Dkt. # 80 at 34.  The evidence of improper motive consists of:

$   the timing between Deputy Wallace's declaration of his candidacy for Island County Sheriff (July 2005) and the investigation (February 2006);

$   Sheriff Hawley's pre-investigation statement to former Island County Sheriff Burt that he supported "anybody but Jay Wallace"[18] as candidate for Sheriff (Dkt. # 78 at ¶ 20);

_____

[18] The Court recognizes that Sheriff Hawley disputes that he made such a statement.  Dkt. #85 (Second Hawley Decl.) ¶6.  However, the Court must review the facts in the light most favorable to the non-moving party.

$  Sheriff Hawley's decision to appoint high-level investigators regarding the potential policy violations and false statements rather than allowing the matters to be resolved at "the lowest supervisory level" (Dkt. # 70-2 at 13);

$  an email from Sheriff Hawley to Jan Smith proposing questions for the candidates, including "Assuming all the facts to be true as have been reported, what is your opinion of the [union's] vote to support Mr. Jay Wallace's appeal of his termination for dishonesty and shirking his duty?" (Dkt. # 69-4 at 11);

$  an email from Jan Smith to Sheriff Hawley stating "RE Mystery Weekend . . . . . Are you kidding, that got delegated too.  Laura - Sheriff in waiting – is doing it . . .  I can see it now in 2010, it will be Mauck v. Price . . . oh and Jay Wallace with the Green Party . . .  You thought things could get worse!" (Dkt. # 69-4 at 4); and

$  the testimony of Sgt. Norrie that Jan Smith "made it very clear that Deputy Jay Wallace was a threat, that they would do anything in their power to make sure that he would not have that ability to become a future sheriff, and actually went to some extreme measures to see that that would cease and desist for him running for that elected position." (Dkt. # 70-4 at 25).

Viewing this evidence in light most favorable to plaintiffs, the Court finds that plaintiffs have met their initial burden of raising a triable issue regarding whether Deputy Wallace's candidacy was a motivating factor in the decision to terminate him.

Defendants, however, have conclusively shown that, even in the absence of the protected activity, they would have reached the same decision.  As discussed above, the CJTC has already determined that Deputy Wallace's conduct in February 2006 justified his termination and decertification, regardless of any First Amendment activity in which he had engaged.  Even if plaintiff's candidacy played a "substantial" part in the decision to terminate his employment, it would not amount to a constitutional violation justifying remedial action.

A rule of causation which focuses solely on whether protected conduct played a part, "substantial" or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing.  The difficulty with the rule enunciated by the District Court is that it would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision even if the same decision would have been

reached had the incident not occurred.  The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct.  A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct.  But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 285-86 (1977).  See also Hartman v. Moore, 547 U.S. 250, 260 (2006) (the First Amendment activity must be the but-for cause of the discharge, otherwise "the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind.").  Given the CJTC's conclusive ruling that termination of Deputy Wallace's employment was justified by his non-First Amendment conduct, Deputy Wallace cannot establish that defendants' explanation was merely pretextual.

Defendants' motion for summary judgment with regards to plaintiffs' First Amendment claim is therefore GRANTED.

**F.  Arbitration Award Procured by Fraud or Misconduct Claim**

Plaintiffs allege that the arbitration award and CJTC decision were procured by fraud, corruption, or undue means.  Dkt. # 49 at 14-20.  For the reasons discussed above in Section II, plaintiffs have failed to produce evidence from which one could conclude that fraud or misconduct justify vacation of the prior decisions.

Defendants' motion for summary judgment regarding plaintiffs' challenges to the arbitration and administrative decisions is GRANTED.

**G.  Tortious Interference**

Plaintiffs allege that Deputy Wallace "had a business and political office expectancy with the probability of future economic benefit, i.e., to become the next elected Sheriff of Island County at the general election in November 2006."  Dkt. # 49 at 20.  It is hard to fathom how anyone could have a legitimate "business expectancy" in a political office, and

plaintiffs have not shown that Deputy Wallace had any right to expect that he would be the Republican nominee, much less the eventual winner of the general election.

Plaintiffs have also failed to show that they had a reasonable business expectancy in Deputy Wallace's "employment contract with Island County as a sheriff's deputy" or that defendants improperly interfered with that expectancy. Dkt. # 49 at 23. Deputy Wallace's employment could be terminated "for good cause in accordance with Civil Service Rules." Dkt. # 70-2 at 18. The CJTC has already determined that Deputy Wallace falsified his February 14th report and was justly terminated and stripped of his peace officer certification.

Defendants' motion for summary judgment regarding plaintiffs' tortious interference claim is GRANTED.

## H. Intentional and Negligent Infliction of Emotional Distress

Plaintiffs claim that defendants' investigation and termination of Deputy Wallace was "done intentionally or recklessly, was extreme and outrageous, and caused the plaintiffs to suffer severe emotional distress and health problems." Dkt. # 49 at 23. Based on the facts known at the time (including Deputy Wallace's responses to the dispatcher and Ms. Walker's subsequent allegations), the initiation of an investigation regarding Deputy Wallace's handling of the 911 calls was eminently reasonable. When Deputy Wallace filed an official report that not only contradicted his contemporaneous statements but was also inconsistent with other evidence obtained during the criminal investigation of Mr. Friar, an investigation into possible false swearing became justified. Neither of these investigations was recklessly undertaken or could be considered extreme or outrageous. Deputy Wallace's termination following findings that he had, indeed, breached Sheriff's office policy and violated the law was not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Birklid v. Boeing Co., 127 Wn.2d 853, 867 (1995) (quoting Grimsby v. Samson, 85 Wn.2d 52, 59 (1975)). Such internal accountability, far from being outrageous, should be lauded. Plaintiffs have failed to make out a claim for intentional infliction of emotional distress.

The law of Washington is extremely generous in providing recovery for the negligent infliction of emotional distress as long as that distress is associated with physical impact and injury. The state courts are less generous, and have expressed significant concerns, regarding claims for emotional distress in the absence of physical harm, however. In their attempts to limit the scope of liability for negligent infliction of emotional distress, the state courts have developed certain tests and prerequisites designed to weed out dubious claims. One of the requirements imposed on a claimant who was not physically injured is that he prove his emotional distress through medical evidence. See Hegel v. McMahon, 136 Wn.2d 122, 132-35 (1998). Plaintiffs have not met this requirement and have, therefore, failed to raise a genuine issue of material fact regarding a critical element of their negligent infliction of emotional distress claim.

Defendants' motion for summary judgment regarding plaintiffs' emotional distress claim is GRANTED.

**I. Defamation and False Light**

"To establish liability for defamation there must be a false and defamatory statement concerning another, an unprivileged communication to a third party, fault amounting at least to negligence on the publisher's part, and either actionability of the statement or special harm caused by the publication." Eastwood v. Cascade Broadcasting Co., 106 Wn.2d 466, 470 (1986). "The degree of fault is negligence for a private person and actual malice for a public figure or public official." Corbally v. Kennewick Sch. Dist., 94 Wn. App. 736, 741 (1999). Deputy Wallace's conduct was that of a public figure or official at all times relevant to his claims, and he must show that defendants acted with actual malice. In addition, statements that communicate ideas or opinions cannot support a defamation claim: false opinions are simply not actionable. Schmalenberg v. Tacoma News, Inc., 87 Wn. App. 579, 591 (1997). A false light claim involves many of the same elements. Representations regarding plaintiff are actionable when defendant publicizes a matter that places another in a false light if (a) the false light would be highly offensive to a reasonable person and (b) the actor knew of or recklessly

disregarded the falsity of the publication and the false light in which the other would be placed. Eastwood, 106 Wn.2d at 470-71.

For purposes of their defamation and false light claims, plaintiffs object to defendants' statements to the arbitrator that Ms. Walker had been raped and beaten because of the implication that her injuries were a direct result of Deputy Wallace's failure to perform his duties. As discussed above, however, there was ample evidence to support Ms. Walker's allegations of physical and sexual abuse on the night of February 7th. The fact that the assault was never proven in court does not mean that it did not occur. Deputy Wallace has not shown that Ms. Walker's story (as repeated by defendants) was false or that defendants' recitation of the story was the result of actual malice or reckless disregard. Thus, these statements are not actionable defamation or false light. In addition, the statements were made in the context of an arbitration proceeding. Under both Ninth Circuit and Washington law, such statements are entitled to immunity in order to protect the decision-making process from reprisals by dissatisfied participants. See Wasyl, Inc. v. First Boston Corp., 813 F.2d 1579, 1582 (9th Cir. 1987) (comparing the functions and decision-making process of arbitration proceedings before applying arbitral immunity); Story v. Shelter Bay Co., 52 Wn. App. 334, 338 (1988) (finding that an absolute privilege is appropriate where the presiding authority has "the power to discipline as well as strike from the record statements which exceed the bounds of permissible conduct").

Plaintiffs also object to allegedly defamatory statements Sheriff Hawley made to KIRO-TV and other members of the press. Dkt. # 80 at 25. The exhibits to which plaintiffs cite contain a videotaped interview and numerous newspaper articles. The latest article that attributes statements to Sheriff Hawley is dated February 3, 2007.[19] Dkt. # 74-1 at 16.

_____

[19] The Court notes that there is no evidence that the statements attributed to Sheriff Hawley in the February 3, 2007, article were made by Sheriff Hawley at the time the article was published. Based on the contents of the articles, it appears that any objectionable statements were actually made between February and April 2006. See Dkt. # 72-1; # 74; # 74-1.

ORDER REGARDING MOTIONS FOR
SUMMARY JUDGMENT - 32

1  Plaintiffs did not file a notice of claim with Island County until March 11, 2009, and did not
2  initiate this action until May 11, 2009.

3          Claims for defamation or false light must be brought within two years from when
4  the claims accrue.  RCW § 4.16.100(1); <u>Eastwood</u> 106 Wn.2d at 474.  Generally, a cause of
5  action accrues when the party has a right to apply to a court for relief.  <u>U.S. Oil & Refining Co.</u>
6  <u>v. Dep't of Ecology</u>, 96 Wn.2d 85, 91 (1981).  Although the discovery rule delays accrual of a
   cause of action until plaintiff knew or should have known the essential elements of his claim
7  (<u>Allen v. Wash.</u>, 119 Wn.2d 753, 758 (1992)), plaintiffs offer no theory or explanation that
8  would excuse their lack of action for more than two years after publication of Sheriff Hawley's
9  last objectionable statements.  The statements were made to the press, they were not
10 confidential or otherwise undiscoverable with the exercise of reasonable diligence, and they
11 were published in the media more than two years before the claims were brought.

12         Defendants' motion for summary judgment regarding plaintiffs' claims for
13 defamation and false light is GRANTED.

14
                                    **CONCLUSION**
15
16         For all the foregoing reasons, plaintiffs' motion for partial summary judgment
   (Dkt. # 83) is DENIED.  Defendants' motion for summary judgment (Dkt. # 58) is GRANTED.
17 The Clerk of Court is directed to enter judgment in favor of defendants and against plaintiff.

18
19         Dated this 13th day of December, 2011.

20
21                                    _MW S Casnik_

22                                    Robert S. Lasnik
                                      United States District Judge
23
24
25
26
   ORDER REGARDING MOTIONS FOR
   SUMMARY JUDGMENT - 33